We will hear argument next in number 23-1073 Savvy Dog Systems v. Pennsylvania Coin. Mr. Hill. Thank you, Your Honor. Good morning. May it please the Court, my name is Steve Hill. I represent the appellants in this action. We're here because the District Court, on a motion to dismiss, held that Claim 44 of the 223 patent failed Step 1 of the Mayo Alice Test and then on summary judgment determined that there was no genuinely disputed issue of law or no genuinely disputed issue of fact to preclude the entry of summary judgment at Step 2 in the same framework. I'm going to first address the motion to dismiss holding by the lower court. Looking at Claim 44, which is at the appendix at 140, we see a technological claim. One small matter of housekeeping. Do we need to address the claim construction question if we agree with the District Court about 101? No. Okay. The one reason I ask that, I think in the red brief, there's a listing of claims and Claim 50 doesn't seem to be in the listing of 101 claims. Is that just nothing to worry about? That may be an error, Your Honor, because there have been a lot of claims that have been disclaimed as the record reflects or as a continuing business method of review. Okay, but in any event, if the 101 ruling is upheld, the claim construction ruling need not be addressed. That is correct, Your Honor. Here, as I was saying, we have a claim that is driven by specific rules that determine the nature of the game processor. The game processor is configured for, and then it's followed by six steps, some of which, including the testing and the automatically displaying step, have specific language within them that defines not only the what of the characteristic of the rule, but also the when. Now, the District Court said Claim 44 is analogous to this Court's decisions in cases like N. Ray Smith, N. Ray Marco, Goldanar, and also Planet Bingo, where the claim is covering rules for playing a game. There is a distinction that I wish to draw between the notion of rules for playing a game in those cases and the structure of Claim 44, because specifically in each of those three cases that the District Court relied upon, the claims actually got into the interior of the game as it was being played, whether it was blackjack in N. Ray Smith or whether it was the active playing of a bingo game in Planet Bingo. Of course, if you're actually playing the game, the rules of the game really matter at that point. But if you look at the fifth rule of Claim 44, it recites, determining if the player has decided to play the displayed game. And then you go to the final rule of the claim, and it displays an outcome resulting from play of the displayed game. The rules of the game itself are actually agnostic to Claim 44. But R101 jurisprudence goes well beyond rules of the game, right? And so then you have to show that even though this is going beyond the rules of the game, it's somehow not abstract in doing so. For example, determining if a player has decided to play and displaying an outcome. How does that change it so it's not abstract? Right. Your Honor, in looking at a case like McGrow, for example, the rules that are at issue in that case are driving a software structure or process that is creating a new kind of software for animators to use. Here, the process that's described within the framework of the game processor and its concomitant rules is undeniably a technological process. What is the technological improvement that's gained by Claim 44, precisely? Prior art electronic game terminals played games of chance. And as a result, they could not transform the game in the setup of the game so that it was a new kind of game. And that's exactly what Claim 44 does. And this is at the appendix 1692, paragraph 7. That's the statement of facts that the appellees put in favor of their summary judgment motion. So I understand. Make sure I understand correctly. So none of the prior art games would allow the player to see what the game board was prior to the play. Is that what it is? That's the technological improvement? That's one part of the technological improvement. The technological improvement, the end result of the technological improvement is you have a game of elevated skill that was created not from the rules of the game itself, but from the rules used in the architecture of setting up the game before it's even been shown to the player. Can you explain how this is a game of elevated skill over the prior art Tic-Tac-Fruit? My understanding, Tic-Tac-Fruit, you commit to playing the game, and then the Tic-Tac-Fruit display will show you the game board on the monitor, and then you the player, I assume, have some period of choice on where to put the wild card inside of that grid. How is that, I don't know, more a game of random chance than the game that you've set up in your claim where you set up that same game field before you initiate the play, or before you commit to initiating the play? It's counterintuitive, Your Honor. But both times, a player, a would-be player, gets to look at the game and then try to figure out where they're going to alter the playing field in order to maximize their winnings. Respectfully, Your Honor, I disagree regarding the prior art version of Tic-Tac-Fruit. In the prior art version of Tic-Tac-Fruit, the player pressed play, and only after that could the player see the game field. And it was only after that, according to the record, that it was only after pressing play that the process of even constructing the game board began. So there was no technological way in the code of that game for it to show the game board to the player before the player had made the decision to initiate gameplay by pressing play. So what is the technological improvement that occurred? What was the problem that the software designer or engineer had to confront in order to be able to change the timing of when the outcome would be displayed, before or after the person started play? Right, Your Honor. Well, the record does reflect that there were concerns about whether or not the prior art Tic-Tac-Fruit went far enough in terms of elevating skill over chance. Because what the prior art Tic-Tac-Fruit game did for the first time was it used the testing that's described in the testing step of Claim 4. This is in 2004, when the prior art game was created. It used that testing step as a way of getting away from the use of a random number generator, which, of course, infuses a game. I mean, that's sort of become the talismanic symbol of what a game of chance is, is the use of a random number generator. But instead, he used this testing algorithm that's described in column 4. That's in the Tic-Tac-Fruit. That's in the prior art Tic-Tac-Fruit. You're correct, Your Honor. And so that was thought to, the elimination of the random number generator was thought to have created enough of an elimination of chance in order to alter the skill versus role of chance balance to make the game a skill game. When that fell into question, the inventor went back to the lab, so to speak, in order to determine if there was anything else that could be done to the way that the game was set up that would elevate the importance of player skill and reduce the role of chance. So then, therefore, the claim to dance here over prior art Tic-Tac-Toe is displaying a preview of the game before the player commits to playing the game. That is correct, Your Honor. So doesn't that mean that what we have here is a set of rules for a game plus a familiar economic course of conduct of giving a preview to a potential customer and the opportunity for the customer, based on the preview, to decide whether to engage in that transaction. Both of those things, abstract. Your Honor, I see my time has expired. Yes. Respectfully, the purpose of the continuing business method review was to eliminate and disclaim all of the claims in the patent, the 223 patent, that related to an economic transaction. There's no necessary nexus between an economic transaction with Claim 44, the way Claim 44 is. I wasn't asking anything about CBM standards. There's a whole set of cases or pieces of doctrine. One of the kinds of things that's abstract, based on Alice, are various kinds of familiar economic transactions or practices. Why isn't the, here's something you might want to take a look at in order to see whether you want to continue to actually enter into the transaction. Namely, play the game. So that on top of what's left is just the rules of the game being offered. What's wrong with that way of looking at it? Respectfully, Your Honor. In looking at Claim 44, we see two specific concrete rules. The testing and the automatic displaying. These are not only the what, but they also answer the question of the when. And we see these as being... But isn't the testing just part of defining the rules of a particular game? No. The testing is to determine whether or not. So there's an algorithm that's laid out in Column 4, starting at Lines 55 and ending at Line 64. And what that algorithm lays out is that the processor actually starts the construction of the game board by choosing the winning lines. Then chooses the orientation of those lines. Then chooses what the winning symbol will be. After which, it then populates the remaining portion of the game. And it then tests by going back and making sure that in populating the remaining symbols of the game that are not supposed to be a part of the winning combination. That it hasn't inadvertently created a scenario where the player could have a winning combination with symbols that are higher in value than what the processor has. Tic-Tac-Fruit does this testing scheme too, right? Yes, Your Honor. But on Alice Step 2, the fact that the inventor used the testing technique on one prior occasion does not, in our view, rise to the level of making the testing conventional, well-understood, or routine. So some people would say that the rules of the game might include the setup of the board, right? So isn't the testing and how to set up the board, isn't that part of the rules of the game? Here, no. Respectfully, because what's admitted in the case at Appendix 1692, Paragraph 7, and the District Court reiterated this during the summary judgment hearing at Appendix 428, is that it's undisputed that the claim here is actually capable of creating a new kind of game, a game of elevated skill. But it's because of the testing and the automatic displaying limitations which structurally infuse a level of skill or a reduced layer of chance into the game before the game is actually played. It's agnostic as to what kind of game. Do you agree that the testing can't satisfy Alice Step 2 alone because it's conventional, since it's part of the prior art Tic-Tac-Toot game? Respectfully, Your Honor, I don't agree with that because in Berkheimer 1, this court looked at the issue of whether disclosure of something in the prior art automatically rose to the level of well-understood, routine, or conventional. In this case, there is evidence that the testing was in the prior art that one time, but there is no additional evidence in the record suggesting that it was in any way routine or conventional or well-understood to the gaming arts community. I see my time's about to expire. We'll restore your remand time. Thank you. Mr. Gorman. Good morning, Your Honors. May it please the Court. My name is John Gorman. I represent the appellees. To answer the question that you posed to counsel at the outset, Claim 50 was disclaimed, and so it's not an issue. This court... I'll also mention that we also agree that this court need not reach the claim construction issue if it agrees with the district court that the claims of the 223 patent are invalid under Section 101. So I'll start with Section 101. The district court correctly decided that the claims of the 223 patent are directed to an abstract idea, rules of a game which all involve this concept of previewing a game to a player before the player actually plays the game. The specification of the 223 patent makes clear that the patentee was setting forth not to address some sort of technological deficiency that existed in the prior art. The patentee was trying to address a legal problem, that there were certain states that... Technological solutions can solve legal problems. They may, Your Honor. But in this case, many of this court's cases have looked to what the particular problem that is to be solved to determine whether or not, in fact, there was a technological solution. Here, there was no technological problem that was identified. So even if it was a legal problem that was seeking to be solved, if there was some hurdle, technically, that prevented them from being able to do this easily and they had to go to the drawing table and come up with all these details on how you would display at a particular time, that could still be a technological solution to a technological problem, right? In theory, but in this case, if you look at the claims, there is no such detail in any of these claims. These claims just recite, as the opposing counsel just said, a new kind of game. Is there anything in the specification that supports the idea that the inventors struggled with how they were going to automatically display an actual game as a technological matter, a computer software? There is not. There's no reference to improving the efficiency of computers or making computers faster or anything in particular about a technological issue that was being addressed at all in the specification. In fact, the only difference between what these claims were addressing and what was in the prior art Tic-Tac-Fruit game was this concept of preview. In fact, if you take Claim 44 and you look solely at the automatically displaying limitation and you change the word prior to to after, you are reading on the prior art. So this is a classic example of claims being directed to an abstract idea invoking basic computer components as tools, not as a technological improvement. So the district court was correct that the claims of the 223 patent are directed to an abstract idea. At Alice Step 2, claims of the 223 patent lack a transformative inventive concept. Certainly beyond these recited game rules themselves, the recital of the computer components are generic things like game processor terminals. What about testing the game field prior to displaying the game to the player? Is that something that could be a technological improvement that transforms the abstract nature of the claim? It was conceded below that that testing step, the idea of testing the game field and then displaying the game field to the player was in the prior art Tic-Tac-Fruit game. What about this argument that we heard this morning about just because something's in the prior art doesn't mean it's conventional and well-known? Well, there isn't anything that suggests that by adding the testing step, there was something that was unconventional about it either. The record doesn't suggest that the testing step was somehow providing some sort of technological advancement at all. As I understood the other side's argument, the purported technological advancement is that no processor had played this type of game before. That's not a technological improvement, even carrying out the testing. That's just carrying out these abstract ideas. The idea that the automatically displaying step, which is truly the only difference between the prior art Tic-Tac-Fruit game and the claims of the 223 patent, that is just simply an abstract idea in itself as the only difference. And so this court should affirm the district court's finding that at Alice Step 2, the claims lacked a transformatively inventive concept. I'm happy to address, for your honors, the... We didn't hear any actual argument on the construction point, so we don't have anything to respond to, but obviously... What if Tic-Tac-Fruit had never been invented, and this is the claim in front of us, and nobody had before tried to test the game if it was to be displayed prior to displaying it, and so these people were the first people to have this type of game not rely on a random number generator, but they kind of put the fix in to make sure that things wouldn't get out of control by having this testing scheme. Would that be patent eligible? I think there could be a way to recite a testing step with sufficient detail in a way that that, in theory, could provide some sort of past muster under Section 101, but under these claims, even assuming that there wasn't a prior art game that did the testing and displaying step, I think these claims would still be recited and directed to an abstract idea. If you look at each of those steps in the games, they are set forth at such a high level that as we put forth in our briefs, these are things that if you strip the claims away from the computer components, these are things that could be played by two people with a deck of cards. So perhaps, but with respect to these claims, even in the instance where the prior art didn't do it, these claims would still be invalid under Section 101. I'll address briefly the claim construction argument. What I've been saying at least before is we didn't hear any argument about that. You don't have anything to respond to, but if my colleagues want to hear about it, that's fine. Well, I'll return to the remainder of my time. Thank you, Your Honors. Thank you, Your Honor. The testing and automatically displaying limitations improve the electronic game terminals as tools for delivering games to the players, and in that sense, Alice Step 2 remains a viable alternative, and the district court erred in determining that there was no factual dispute when, in fact, the court made no fact findings on whether or not the testing limitation was routine or conventional, merely referenced that the testing was shown to exist in the prior art. Again, the only prior art that shows any testing limitation is the 2004 Tic Tac Fruit game that preceded the patent application by two years. It's by the same inventor, and there's no indication in the record that anyone else ever picked up on it such that it became something that could be fairly described as conventional or routine in the gaming arts. I want to respond briefly... So an inventor could kind of double-dip on the same inventive concept? One patent application, it's the inventive concept. The next patent application, two years later, I would go back and say, that's my inventive concept still? Your Honor, the inventive concept here is not the testing limitation in isolation. It's the testing in combination with the automatic displaying limitation. And I beg to differ with my colleague regarding the characterization of how you could take the word in the automatic displaying limitation and change prior to to after to, and you'd have the prior art version of Tic Tac Fruit. In fact, that's not accurate because what he neglects to point out is that in the testing limitation you also have the prior to displaying language which would be absent in the prior art Tic Tac Fruit as well. And there was struggle here. Tic Tac Fruit does the testing after the display of the game? No. It does it before the display of the game. Correct. But if the display of the game is after the player initiates play of the game, then that's why the claim would read on Tic Tac Fruit. Right? So long as you've changed in the automatic displaying limitation the phrase prior to to after. In both of the limitations. You would be right. What I'm saying, Your Honor, is that technically the testing limitation the way that it's described in the claim with the prior to language is also absent from the prior art Tic Tac Fruit. There may be reasons for that and there's obviously a one of three argument that can be made. Are you saying that there's prior to language testing the game field prior to display? And I thought you agreed that Tic Tac Fruit did that. Tic Tac Fruit did the testing in the algorithmic process. Before display? Before... Well, yes, of course, before displaying the game. If by displaying the game we mean displaying the game after the player has pressed play and initiated the game to be played. The testing has to precede the display in the prior art Tic Tac Fruit. The testing was not initiated until after the player pressed play. So the testing and automatic displaying limitations of this claim technically are not practiced in the prior art, even in the prior art Tic Tac Fruit. I'm still confused by that. And it's really because the testing says testing the game field prior to displaying the game to the player. Stop. So that's what Tic Tac Fruit did. So it might be that Tic Tac Fruit didn't automatically display an actual game to be played until later, but I'm having a hard time following your argument about testing for the same reasons my colleagues have both pointed out so far. Okay, all right, I will move on because I think that if I'm the only one that seems to be understanding that point in my own mind, I'm fully prepared to recognize that that's not going to be outcome determinative on step two, and there's still one or two more arguments that I'd like to get to that my colleague made. The inventor struggle is noted in the record in our statement of facts and in our reply brief at appendix 1743 through 1745. You'll find the description of the inventor's own testimony about the technological tasks that had to be done in order to transform the prior art Tic Tac Fruit into the subject matter of the 223 patent. And finally, the human card analogy. There are several cases now, I'll use data engine as one, where human analogs are not necessarily dispositive of step one of the Mayo Alice framework. If they were, the fact that I got tabs in my notebook here would have potentially disposed of data engine at Alice step one in the opposite way from which this court ruled. Thank you, Your Honor.